UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

JULIE DALESSIO,                    )
                                   ) CASE NO. C17-642 MJP
              Plaintiff,           )
                                   ) SEATTLE, WASHINGTON
v.                                 )
                                   ) June 5, 2019
UNIVERSITY OF WASHINGTON, et al.,) 2:00 p.m.
                                   )
              Defendants.          ) MOTION HEARING
                                   )

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

  For the Plaintiff:      JOSEPH THOMAS
                          Law Office of Joseph Thomas PLLC
                          14625 SE 176th Street, Apt N101
                          Renton, WA 98058


  For the Defendant:      JAYNE LYN FREEMAN
                          Keating Bucklin McCormack, Inc. PS
                          801 Second Avenue, Suite 1210
                          Seattle WA 98101


  Reported by:            NANCY L. BAUER, CCR, RPR
                          Federal Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          (206) 370-8506
                          nancy_bauer@wawd.uscourts.gov

```
 1   June 5, 2019                                    2:00 p.m.
                         PROCEEDINGS
 2   _____
 3          THE CLERK:  This is the matter of Julie Dalessio
 4   versus University of Washington, Cause No. C17-642 MJP.
 5      Counsel, please make your appearance for the record.
 6          MS. FREEMAN:  Good afternoon, Your Honor.  My name is
 7   Jayne Freeman.  I'm a special assistant attorney general
 8   representing the defendants in this matter.
 9          THE COURT:  Good afternoon.
10          MR. THOMAS:  Good afternoon, Your Honor.  My name is
11   Joseph Thomas, and I'm pro bono counsel for plaintiff Julie
12   Dalessio.
13          THE COURT:  Good afternoon.  And I understand that
14   we've made arrangements.  Ms. Dalessio is on the phone,
15   listening to us?
16          MR. THOMAS:  Yes, Your Honor.  That's my
17   understanding.
18          THE COURT:  All right.
19      Counsel, we're here for our second round of summary
20   judgment motions, and I have had an opportunity to read the
21   defendants' second motion for summary judgment, the
22   plaintiff's response, the defendants' reply, the objection to
23   new evidence of defendants' reply to the second motion for
24   summary judgment, the defendants' response to the plaintiff's
25   objection.  And I also drafted a series of questions that you
```

1   should have received that I would like you to answer during

2   the course of your oral argument this afternoon.

3        You don't have to take them in order, but at some point

4   during your argument, I ask that you answer the questions.

5        So, defense, who will speak?

6             MS. FREEMAN:  I will, Your Honor.

7             THE COURT:  All right.

8             MS. FREEMAN:  Would you like me to approach the

9   podium?

10            THE COURT:  If you would, please.

11            MS. FREEMAN:  All right.  Thank you, Your Honor.

12       Because this is a second round of -- a second summary

13  judgment motion, and the court has addressed a number of the

14  issues in this case already, I will try to be brief and get

15  to the point and address the questions that the court posed

16  to us.

17       As we know, this is a case involving a public records

18  release that occurred in 2015, that we've been referring to

19  as the "Betz request," and that was a situation where a

20  citizen made a public records request from the University of

21  Washington for records related to Ms. Dalessio, the plaintiff

22  here, who had previously worked for the University of

23  Washington but no longer worked there.  Records were

24  released, they were heavily redacted, and hundreds of pages

25  were withheld pursuant to public records exemptions.

1     The court has already ruled, dismissing plaintiff's claims

2   were based on various pieces of information that were either

3   not redacted or -- well, that were not redacted, and has

4   dismissed the claims against all of the individual defendants

5   based on that.

6     We're here today to address, really, the same issues and

7   the same claims based only on pieces of information that were

8   produced that Ms. Dalessio claims constitute private medical

9   information.  And at this point in the case, the only

10  defendants that remain are four individual defendants:

11  Alison Swenson, the individual University employee who did

12  redact and produce the records; Andrew Palmer, who is an

13  individual employee in the public records office who

14  subsequently produced a set of the same copies in unredacted

15  fashion only to Ms. Dalessio herself and never to any third

16  party; Perry Tapper, who is a supervisor in the office; and

17  then Eliza Saunders, who is the director of Office of Public

18  Records.  And the remaining claims are based on 1983 claims

19  based on Fourteenth Amendment privacy interests and Fourth

20  Amendment search and seizure.

21     Your Honor, we've -- we've -- I think there's been a lot

22  of briefing and some rulings already on issues of qualified

23  immunity.  The specific question that you addressed to the

24  defendants to discuss today related to the plaintiff's

25  argument about a pattern or practice, the court has already

1   ruled on a number of key elements in this case, and I'll just

2   list them quickly:   Number one, that negligence cannot

3   support a constitutional claim or a 1983 claim.  Nothing has

4   changed there.

5       Second, that individual defendants are entitled to

6   qualified immunity, under 1983, if they did not intentionally

7   violate clearly established law.  There has been a lot of

8   discussion, briefing, and some rulings about whether the law

9   is clearly established in this area, and I believe as we are

10  approaching today, with the number of questions the court has

11  had on this issue as it has turned its attention to medical

12  information, one thing that has become clear is that the law

13  in this area is even less clear.  There are no precedent

14  cases that provide a distinct ruling on precise issues that

15  we have before us today on similar facts.  But what we have

16  done is draw from other areas of qualified immunity and

17  constitutional law to demonstrate that a constitutional

18  violation did not occur here.

19      So when we get to the argument of pattern or practice, I

20  believe the defendants have already established that each of

21  the individual defendants are entitled to qualified immunity

22  from plaintiff's claims.  Number one -- well, basically,

23  because plaintiff still has not proven a constitutional

24  violation at all.  In order to get past qualified immunity

25  against individual defendants, the plaintiff has to

1   demonstrate that an intentional act occurred, that a

2   constitutional violation actually occurred, and then we look

3   at whether each of those individual defendants should have

4   known at the time that what they were doing, as part of their

5   job duties, violated Ms. Dalessio's constitutional rights and

6   then went ahead and did it intentionally anyway, knowing that

7   that would occur.  There is no evidence that any of the

8   individual defendants took any such action.

9       The evidence also does not establish that a constitutional

10  violation occurred at all.  The court has already ruled, with

11  regard to the Fourth Amendment search and seizure issue, that

12  the facts here do not establish a constitutional violation.

13  That ruling should apply exactly the same way to any

14  information that is allegedly private medical information as

15  it did to any information that was data.

16      The defendants in this case took no different action with

17  regard to administering their Public Records Act

18  responsibilities, receiving requests, requesting files from

19  the various employment departments where Ms. Dalessio worked,

20  and then administering various exemptions and whatnot under

21  the PRA.

22      With respect to the Fourteenth Amendment claim, and I

23  believe this is where Ms. Dalessio really focuses her

24  efforts, even with regard to information that she

25  characterizes as medical information, we still need to go

1   through the same analysis:  Number one, intentional act;

2   number two, still looking at the difference between a privacy

3   interest in medical information and a constitutional right --

4   the constitutional right of privacy.

5       The cases that we've cited, the case law makes clear that

6   a constitutional right to privacy is much, much higher and

7   very distinguishable from a mere interest in privacy and has

8   made clear that even information that might be medical

9   information does not necessarily always rise to the level of

10  constitutionally protected medical information.  The

11  information that is disclosed and the context in which it was

12  disclosed and the people who it was disclosed to must be

13  shocking, egregiously embarrassing, and other terms like that

14  that the courts use to describe information that meets the

15  standard.

16      Understanding that there is no evidence that could

17  overcome qualified immunity for each individual defendant

18  here, the plaintiff has thrown out language of, quote,

19  practice and policy -- or widespread policy.  Sorry.  The

20  language -- the pattern or practice.  Excuse me.

21      That language only arises in cases involving claims

22  against municipalities, typically where we're not looking at

23  an individual actor anymore or the liability of an individual

24  actor, but we're looking at the potential liability of a

25  municipality.

1      The fundamental, underlying elements of a 1983

2   constitutional claim are still there, though.  Number one,

3   there has to be intentional conduct, but number two, there

4   has to be evidence and proof of a constitutional violation,

5   not just a pattern or practice of something, or even a

6   pattern or practice of negligence.  There has to be evidence

7   of a pattern or practice of constitutional violations.

8      So the very first starting point, if we look at policy and

9   practice language, has to start with finding that a

10  constitutional violation occurred, and then go on to see if

11  it's occurred again and again to the point where the

12  municipality or the governmental organization should know

13  that if they keep sending their people out there and telling

14  them to do this, you know, let's say Tasers are a new thing,

15  and police officers are told to go out and shoot Tasers into

16  people's heads and they keep telling them to do that, and

17  they say, "Yes, this is what we tell our people to do," and

18  that is ruled or declared excessive use of force, those are

19  the types of situations where we usually see pattern or

20  practice question arise.  It's where we see, for example, in

21  police cases, police departments tell their officers to go

22  use certain equipment, take certain action in certain

23  circumstances, and then see it in action and see that it is

24  actually an excessive use of force, hear from the courts that

25  it's an excessive use of force, in violation of the

1   Constitution, and then continue telling them to do it the

2   same way.  We don't have those facts here.  We also don't

3   have a defendant to which a pattern or practice claim

4   applies.  We have four individuals here.

5        Plaintiffs are using pattern or practice language, and the

6   way it is put is that pattern and practice, in and of itself,

7   is somehow a higher standard than negligence, but it's still

8   not a standard that establishes a constitutional claim.

9        If plaintiff's argument is that they believe or they

10  allege that information may have been inadvertently disclosed

11  at different times related to different people, that, in and

12  of itself, even if it were true, does not establish a

13  violation of Ms. Dalessio's constitutional rights, nor does

14  it establish a claim of constitutional magnitude or a 1983

15  claim against Ms. Swenson, Mr. Palmer, Ms. Saunders, or

16  Mr. Tapper, who are the only remaining defendants in this

17  case.

18       And I will turn the argument over to the plaintiff,

19  because I believe there is some questions that you wanted to

20  address there, unless you have questions for me, Your Honor.

21            THE COURT:  I don't.  Thank you, Ms. Freeman.

22            MS. FREEMAN:  Thank you.

23            THE COURT:  Mr. Thomas?

24            MR. THOMAS:  Thank you, Your Honor.

25       So I spent a lot of time this morning going over the

1   court's questions, and so I'd just like to address those

2   directly, unless the court has any other questions that it

3   would like to ask in the meantime.  So feel free to

4   interrupt.  This is about the court's understanding, so I'm

5   going to try my best to answer all questions that I can.

6            THE COURT:  Thank you.

7            MR. THOMAS:  So the first question this court had was

8   about the case authority for the position of providing

9   confidential materials to plaintiff at her own request, and

10  whether that's a violation of her own privacy right.

11       I think, basically, what this court wants to know, is when

12  plaintiff receives documents about herself, is that violating

13  her own privacy rights, if I understand it correctly.

14       And plaintiff's response to that is, there's no evidence

15  in the record that the documents that Ms. Dalessio received

16  of the private medical information was only produced to

17  herself.

18       There's evidence in the record, from Docket 37 -- first of

19  all, it's Docket 34, pages 69 through 77, that at least some

20  of the information was produced to Mr. Betz first, and then,

21  second, it was produced to Ms. Dalessio.

22       And so under the standard for summary judgment, this court

23  has to look at all reasonable inferences from that evidence,

24  and the evidence would suggest that it's been distributed to

25  multiple people.  And, in fact, defendants have made no

1   attempt to prove -- or no attempt to prove that subsequent

2   events have made it clear that the alleged wrongful behavior

3   cannot be reasonably expected to occur, and that's a citation

4   from *FTC v. Affordable Media LLC*, 179 F.3d 1228, and that's

5   on page 1239, and that's a Ninth Circuit Court of Appeals

6   case from 1999.

7        THE COURT:  Mr. Thomas, aside from the plaintiff and

8   the person making the original request, what proof do you

9   have that her information was distributed to anyplace else?

10       MR. THOMAS:  Your Honor, that's something that I've

11  been talking about with defense counsel over the last couple

12  of days, and there is nothing in the record.  Plaintiffs

13  admit that there is nothing in the record right now, other

14  than what was just mentioned.  But there is newly discovered

15  evidence that will be submitted to this court, in due course,

16  over the next couple of days, that will go to establish that

17  it has been given to third parties subsequently.

18     And this is where the *FTC v. Affordable Media* standard

19  comes in, is that the defendants have not made any attempt to

20  prove that -- that these documents have not been given to

21  third parties.  And I don't want to talk about things that

22  aren't in the record right now, so --

23       THE COURT:  Well, let's talk a little bit about whose

24  burden it is to prove it.  Isn't that your burden, and not

25  the defense's, to prove?

1          MR. THOMAS:  Your Honor, I appreciate you asking that

2    question, because I would respectfully submit that that is

3    information within the defendants' purview, and that's

4    something that they have to submit.

5       So if we look at the Public Records Act, in RCW

6    42.56.550(1), the reason why the Washington State Legislature

7    gave the burden in Public Records Act cases to the government

8    is because defendant can't be -- to prove whether there's

9    unlawful withholding or not is because the plaintiff can't

10   be -- reasonably be assumed to know whether the government

11   has withheld that information or not.  That's something

12   that's within the realm of knowledge for the defendants, and

13   I'd respectfully submit to this court that that's something

14   that defendants have to prove.

15      And then also -- to go to answer this first question

16   again, I would also respectfully submit to this court that

17   the Fourth Amendment has a different answer than the

18   Fourteenth Amendment to this question.

19      So, again, the question is whether providing confidential

20   information to the plaintiff, at her own request, is a

21   violation of the plaintiff's First Amendment rights.  And it

22   seems like we argued -- the plaintiff argued, in the response

23   brief, on pages 13 through 16, that the commingling of the

24   documents under the Fourth Amendment was its own violation.

25      And so I would respectfully submit to this court that

1   there is two separate violations that we've been arguing, and

2   I don't know if that's been abundantly clear.  The first

3   violation is the search and seizure, so it's actually going

4   to get the documents where they shouldn't be going.  This is

5   private information.  There's a lot of case law that says

6   medical information is constitutionally protected.  It's

7   private.  Defendants knew that they shouldn't be going to

8   search that area, and it was unreasonable for them to do so.

9   Whether the ADA and the HIPAA are even looked at, there's

10  independent basis, just from case law, saying that they

11  shouldn't be doing this and it's unconstitutional.  So even

12  the mere fact of going and searching through these areas and

13  seizing it and commingling it with public records that can

14  later then be produced to people is a violation of the Fourth

15  Amendment.

16      So when this court asks, is providing plaintiff her own

17  information a violation of her rights, I would absolutely say

18  yes, because it violates her Fourth Amendment rights to even

19  be getting that information.  That shouldn't have even been

20  searched or seized in that matter, and commingled.

21      So let me move on the court's second question, and the

22  court asked, "Plaintiff alleges that documents in Docket 34,

23  pages 69 through 77 contain protected medical or health

24  information, and the disclosure of which violates her

25  constitutional rights.  Explain what constitutionally

1    protected information is contained in each of the documents

2    cited."

3         So before I get to that, I want to quote the case *In re:*

4    *Crawford*, which has been cited a lot.  It's *In re: Crawford*,

5    194 F.3d 954, page 959, and it's a Ninth Circuit Court of

6    Appeals case from 1999, and that cases says, quote, The right

7    to informational privacy, however, is not absolute; rather,

8    it's a conditional right, which may be infringed upon a

9    showing of proper governmental interest, end quote.

10        And they go ahead and they give a balancing test in order

11   to determine whether the right is infringed or not.  It's a

12   seven-point balancing test, so in order to answer this

13   court's question, I'm going to go over the seven-point

14   balancing test.

15        The first point that they use in order to look at this is

16   the type of records requested.  And so in Docket 34, pages 69

17   through 77, these types of records are medical information

18   about Ms. Dalessio's disabilities, which is protected from

19   disclosure.

20        And *Conroy v. The New York State Department of*

21   *Correctional Services,* 333 F.3d 88 at page 96, which is a

22   Second Circuit Court of Appeals case from 2003 said, quote,

23   Even where a diagnosis alone is not sufficient to establish

24   an employee is disabled, the diagnosis may give rise to the

25   perception of the disability and discrimination on the basis

 1   of the perceived disability is also prohibited, end quote.

 2       And so it's -- so what the court is trying to say is, you

 3   don't even have to go so far as to say the exact disability

 4   is this.  Anything that gives rise to the mere perception of

 5   a disability is prohibited medical information in order to

 6   even produce, and that's what happens here when they're

 7   giving out disability documents, and I'll go into that in

 8   more detail, especially on the second point.

 9       So the Ninth Circuit Court of Appeals, in the *Crawford*

10   case, says they want to look at the information it does or

11   might contain in the documents.

12       And so in Docket 34, pages 69 through 77, especially in

13   Docket 34 at page 69, talks about the accommodation request

14   for a disability or serious medical condition, and that's a

15   direct quote from page 69.  And so this already outlines that

16   it's a disability or serious medical condition.

17       At Docket 34, pages 71 through 73, it states -- it talks

18   about Ms. Dalessio's temporary accommodation with trouble

19   pipetting.  I didn't know what pipetting was.  Apparently,

20   what pipetting is is, you hold something in your hand, and

21   you push down on it with your thumb.  And so when it says

22   that she has trouble pipetting, it says that she has trouble

23   moving her thumb.  And that is talking about a direct

24   disability.  It talks about that she has problems with the

25   range of motion in her thumb or able to use that long-term.

1    So at Docket 34, pages 74 through 77, identifies a form

2    filled out by Ms. Dalessio's supervisor, evaluating her

3    physical needs for the job, submitted, quote, a physician

4    statement, end quote, and whether, quote, this employee can

5    perform the job duties described above, given her current

6    physical restrictions, end quote.  So it talks about a

7    physical disability.  It describes it as a serious physical

8    disability.  It actually describes one of the disabilities as

9    "trouble pipetting," which is the movement of the thumb, and

10   so this talks about medical information in this -- in these

11   documents.

12       And the third point that the *Crawford* court wants to look

13   at is the potential harm and any subsequent nonconsensual

14   disclosures.  Ms. Dalessio never consented to this

15   disclosure.  And as the clear and unequivocal case law that's

16   already been produced to this court states, that once

17   something is in the public record, you can't unring that

18   bell.  Once it's in the public record, it's always in the

19   public record, and you immediately lose your privacy interest

20   in that.  So Ms. Dalessio was harmed when it was placed in

21   the public record.

22       The fourth point the *Crawford* court wants to look at is

23   the injury from the disclosure to the relationship in which

24   the record was generated.  Ms. Dalessio didn't ask about

25   this.  This was disclosed to Mr. Betz, herself, and there is

1   a strong likelihood that the evidence will show that it's to

2   others, too.

3       The fifth point the *Crawford* court must look at is the

4   adequacy of the state to prevent unauthorized disclosure.

5   And that, there are no policies.  This was argued for the

6   court in initial disclosures about whether there was policies

7   or procedures.

8       Ms. Dalessio found, in the Washington Administrative Code,

9   that there were policies and procedures that the defendants

10  didn't produce, and they said, "Okay, well, that's all of

11  them."  There are no policies and procedures to stop this

12  sort of disclosure.  They make these decisions based upon

13  unwritten policies, so there's nothing in the record that

14  would evidence any sort of policy to stop this, and it hasn't

15  been argued in this case yet.

16      The sixth point that the *Crawford* court wants to look at

17  is the degree or need for access and whether there is an

18  express or statutory mandate.  These documents are exempt

19  from disclosure.  There's a statutory mandate in --

20  RCW 42.56.070(1) says that agencies, quote, shall make

21  available for public inspection and copying all records

22  unless exempt by statute.  These are exempt by statute, and

23  so they shall not be disclosed.

24      And the seventh and final point that the *Crawford* court

25  talks about is the articulated public policy where other

 1   recognizable public interests and militating towards access.

 2   The defendants are silent as to any other public policy or

 3   interests, and this was argued by the defendants in their

 4   response to the motion -- to the second motion for summary

 5   judgment.

 6       Specifically on pages -- I say 13 through 16 in here, but

 7   there is a specific page in there, and I don't want to waste

 8   the time looking it up, where we, actually, argue that they

 9   don't state a compelling interest or an interest to

10   counteract or weigh the disclosure.

11       Does that answer this court's question?

12           THE COURT:  That's fine, counsel.

13           MR. THOMAS:  Okay.

14       So the third question is, does plaintiff have any evidence

15   that any protected information was deliberately included in

16   the documents included to Mr. Betz?

17       And, first of all, we started out the motion for -- the

18   response to the motion for summary judgment by talking about

19   Ms. -- Defendant Saunders' job description.

20       Defendant Saunders, by being the director of the Office of

21   Public Records, is also the public records officer.  That's

22   identified in Docket 130-1.  And her job description

23   specifically states, as we stated in the response to the

24   motion for summary judgment, that part of her job is to avoid

25   lawsuits.  It's to mitigate risk, and how she does that is by

1    overdisclosing documents.  Under the Public Records Act,

2    there is no violation of the Public Records Act if you

3    overdisclose documents.  There's only a violation of the

4    Public Records Act if you wrongfully don't disclose those

5    documents or you withhold those documents.  And so they can

6    avoid liability by producing documents that they know are

7    exempt or could be challenged to be exempt.

8         And so that's evidence.

9         There's also a pattern and practice of disclosing private

10   information that is exempt from the Public Records Act that

11   defendants deliberately acted -- first of all, they produced

12   documents that to Mr. Betz -- and this was talked about

13   before.  That's in Docket 34 in pages 69 through 77.  They

14   produced documents to Ms. Dalessio.  That's at Docket 38 at

15   pages 22 through 25, and Docket 38, pages 15 through 16, and

16   Docket 38, pages 4 through 13.  And these were all explained

17   in their response to the motion for summary judgment, so in

18   order to save time, I'm not going to explain where exactly in

19   these documents, unless the court has questions and you

20   want...

21        THE COURT:  Well, I think, perhaps, you misunderstand

22   my underlining of the world "deliberately."  Let's assume

23   these documents got out negligently.  Do you have any

24   evidence that somebody looked at this and said, "Ah, I know

25   how to fix her.  I'm going to disclose this document," as

1   opposed to being careless or negligent in culling or whiting

2   out or blocking out the information?

3            MR. THOMAS:  Thank you, Your Honor.  How I would

4   respond to that is, Defendant Saunders is highly trained, and

5   Defendant Saunders, actually, in her job description, in

6   Docket 130-1, states that she is expected to know about HIPAA

7   and the ADA in order to stop those documents from being

8   disclosed.  And so she's supposed to be able to identify and

9   to look at this.  She has training in this.

10       And pursuant to 42 -- or RCW 42.56.580(1), as the public

11   records officer, Defendant Saunders is expected to oversee

12   compliance with the Public Records Act.  That's her

13   state-mandated position.

14       And so when she has training in this, her job description

15   says that she is expected to know about this subject matter.

16   And it happens at least two times, and possibly more, a

17   pattern and practice arises, and at least this is a

18   deliberate indifference, and this could be very well

19   intentional.  And I think the reasonable inference from this

20   evidence is that it very well could be intentional, but I

21   think it's too early in order to make that call yet because

22   the evidence is not there and I think that this is a disputed

23   issue of material fact that needs to go to trial.

24       So I'll move on to the next question.

25       So on the next question, has the plaintiff been able to

1    identify, through discovery or deposition, written or

2    unwritten policies that direct the production of confidential

3    material as part of the process for complying with the PRA

4    requests?

5        And we would submit -- the plaintiff would submit to this

6    court that the unwritten policy engaging in a pattern or

7    practice of overdisclosing personal, private information to

8    avoid lawsuits, under the Public Records Act, is the

9    unwritten policy.

10       And so discovery was cut short.  Defendants have objected

11   to producing discovery.  There has been two sets of discovery

12   requests made so far.  Defendants have objected, I think, to

13   almost every one.  If I'm wrong, please correct me.  But they

14   did produce some documents to the first set of discovery

15   requests over objection, and they didn't produce many of the

16   requests, but they did produce some documents in the first

17   request.  They didn't produce any documents in the second set

18   of discovery requests.  So we haven't had a chance for

19   depositions.  We haven't had a chance for discovery.  But

20   based upon what we do have, we do have Defendant Saunders'

21   job description that states that she avoids lawsuits.  It's

22   not to comply with the Public Records Act.  It's not to

23   ensure people's rights, which is what the statute is for.

24   It's to avoid lawsuits.  It's to avoid liability.  And, in

25   fact, in the response to the motion for summary judgment, the

1   page that plaintiff quoted, it actually states that there's

2   huge liability.  It says that there was a study, I think, by

3   King 5 that talked about the hundreds of thousands of dollars

4   that the agencies could be paying for Public Records Act

5   violations, and that's in her job description.

6       And so a reasonable --

7           THE COURT:  The King 5 report is in her job

8   description?

9           MR. THOMAS:  It actually references King 5 in her job

10  description.  And the page is actually -- we didn't include

11  the quote, but the page that we cited to, in the very

12  introductory paragraph, I believe, is the page that mentions

13  King 5.

14      And so her job is not -- and it actually mentions

15  hundreds -- I think the number is $500,000 that they mention

16  in that page.  Actually, I can pull it up.

17      So I'm on Docket 130-1, and I believe I'm on page 10 out

18  of 14, and there's a section -- the first section of that

19  page says, "Working environmental conditions," the second

20  page is, "Other comments," and I'll just read -- this is a

21  paragraph.  I'll just read to this court straight from what

22  it says in her job description that was produced in initial

23  disclosures.

24      Quote, According to a February 2011 report by King TV

25  News, fines under the Public Records Act have cost state

1    agencies nearly $5 million in a recent five-year period.  A

2    number of fines for individual public records requests

3    exceeded $500,000.  A King TV report does not appear to

4    include fines to opposing attorneys that are usually awarded

5    by the courts, nor does it include out-of-court settlements.

6    From discussions with others in the transparency community,

7    there appear to be a goodly [sic] number of out-of-court

8    settlements.  King TV's numbers do not include the salaries

9    of the agencies' staff or the AAGs or the SAAGs assigned to

10   litigate these lawsuits.  King TV's report did not include

11   the fines paid by the local cities and counties under the

12   Public Records Act.  While no surveys of these fines can be

13   identified, one other city inside of Washington considered

14   filing bankruptcy or unincorporating itself in the face of

15   losing a single Public Records Act lawsuit.  The fine was

16   over $250,000 for not responding in a timely manner.

17       And this is what plaintiffs were getting at in the

18   introduction to the response for summary judgment.  Her job

19   description clearly says that she is to avoid lawsuits, and

20   this goes to this court's inquiry.

21            THE COURT:  Well, counsel, isn't she supposed to

22   avoid lawsuits in both directions?  In other words, you avoid

23   being fined for underproduction, but you also avoid being

24   sued for overproduction.

25            MR. THOMAS:  Could you repeat that?  I'm sorry.  I

1    didn't catch that.

2            THE COURT:  In other words, certainly any person in

3    this job is supposed to do it well, but their job is to

4    ensure that the state does not get sued for underproduction

5    or failure to produce or failure to produce in a timely

6    manner, just as they are required to not get sued for

7    overproduction or violating people's rights because they have

8    disclosed something, like this lawsuit.

9        So isn't their responsibility to be on both sides of that

10   line?

11           MR. THOMAS:  I would -- I agree with most of that

12   statement, Your Honor, but the part the plaintiff disagrees

13   with is that the record is absent of any lawsuit of public

14   records overdisclosure.  And to be honest, plaintiff hasn't

15   seen a lawsuit over overdisclosure, and that's why it's been

16   difficult, and I think defendants have touched upon this

17   point.  When they spoke during their oral argument, they said

18   there's not a lot of case law about the subject because it

19   really hasn't happened before, to the best of our knowledge.

20   I'll speak to -- for myself.  To the best of my knowledge, it

21   really hasn't happened before, and I haven't seen it in any

22   of the documents to this court.

23           THE COURT:  So doesn't that go -- doesn't that cut

24   against your position that they're doing it, well, because,

25   apparently, there haven't been a lot of overdisclosure cases?

1   So, you know, you're telling me that there is a pattern or

2   practice here of overdisclosure, and yet you can't find any

3   case.

4            MR. THOMAS:  I would disagree with that, Your Honor.

5   I would submit to this court the reason why there are not

6   more cases for overdisclosure is because there is not a clear

7   path for legal redress, as there is for underdisclosure or

8   withholding documents.

9       It is very clear in the statute, RCW 42.56.550(4), that --

10  that provides a cause of action under state law in order to

11  sue for underdisclosure.  There is no clear cause of action

12  for overdisclosure.  We had to find a constitutional argument

13  in order to be able to argue that.  And there's been a lot of

14  criticism for even going along that route, and there doesn't

15  appear to be any other better legal option.

16           THE COURT:  Let me back you up here just a minute.

17  One of the questions I asked was, of the pages that were

18  disclosed, 69 through 77 in Docket No. 32, you talked to me

19  about the pipette issue.  What about that rises to the level

20  of constitutional violation?  What is so outrageous about

21  revealing that somebody's thumb doesn't work right?

22           MR. THOMAS:  Thank you, Your Honor.  And I think that

23  kind of hits home to what -- I think that we're kind of

24  missing each other, and I kind of appreciate that question.

25      There doesn't seem to be a clear definition that we're

1   using about what medical information is, and I think that's

2   the problem.  Defendants come up in their oral argument and

3   say, look, it has to shock the conscience and other things,

4   but there doesn't seem to be a clear definition.  And

5   plaintiff tries to rely on the ADA and HIPAA in order to

6   provide a definition for what medical information is in order

7   to give this court a bright-line standard to answer your

8   question:  What can we look towards to determine whether it's

9   a constitutional violation for the disclosure?  Is it

10  somebody's thumb that's not working, or is it the disclosure

11  of a controversial disease, such as HIV and AIDS.  And I

12  think that's what this court is getting at; what sort of

13  medical information actually rises to a constitutional level.

14           THE COURT:  Well, I'm talking about this disclosure.

15  You're claiming there is a disclosure.  I'm asking you what

16  about these pages is so outrageous or shocking or so

17  embarrassing that it rises to a constitutional level?

18           MR. THOMAS:  Your Honor, to answer your question as

19  direct as I can, any disclosure about a disability is

20  shocking.  Nobody should have to worry about the government

21  disclosing their disability, no matter what the disability

22  is.  Any disability should be private, and that's within the

23  realm of the individual.

24     So what's shocking about this information is just that the

25  government thinks that it's okay in order to release any of

 1   this information.

 2        THE COURT:  So that would make any disclosure

 3   whatsoever shocking, about anything?  A mole on your hand or

 4   a bunion.  You're saying that any disclosure of medical

 5   information is shocking and that it rises to a constitutional

 6   mandate?

 7        MR. THOMAS:  Yes, Your Honor.  And let me draw a

 8   distinction, if I may.

 9      So if this is the police report and -- let's say I'm being

10   arrested, and the police report says there's a mole on my

11   hand, and that police report is released to the public.  I

12   don't think there's a constitutional protection in that mole

13   on my hand in the police report.  However, if the mole on my

14   hand is on a doctor's note that's produced to the public by

15   the government, I absolutely think that there's a

16   constitutional protection in that mole on my hand being

17   produced to the public when it's on a doctor's report.

18      I think that where the mole on the hand, which document it

19   lies in, is where it gets its constitutional protection from.

20        THE COURT:  So you're telling me that I should

21   fashion a rule that says any time a doctor -- what about a

22   medic, what about a nurse, what about a chiropractor?  Any

23   time it falls under any medical notation, that's a

24   constitutional violation that, no matter what the issue is,

25   it shocks to the point of rising to a constitutional issue?

1        MR. THOMAS:  I would say yes, Your Honor.  And that's

2   why plaintiff has been trying to draw comparisons to the ADA

3   and HIPAA.  And while we're not relying upon the ADA and

4   HIPAA, as case law shows, that just release of the medical

5   information is a constitutional violation, I think that this

6   court can look to ADA and HIPAA to decide what information is

7   proper to disclose and what information is not proper to

8   disclose under the Fourth and Fourteenth Amendment of the

9   United States Constitution.

10       And I think that when we look to the ADA, especially as

11  guidance for what information is acceptable in order to

12  disclose, the ADA and the case law interpreting the ADA makes

13  it clear that any information about a person's disability or

14  the perception about a person's disability is prohibited, and

15  that shocks the conscience.  Just like I was telling this

16  court before, any mention or perception about a person's

17  disability should not be disclosed by the government.

18       So going to this court's question about Docket 34, 69

19  through 77, any mention of her disability is off limits, or

20  any mention that could lead to a perception of her disability

21  is off limits.

22       Unless this court has other questions, I'll keep moving on

23  with the pre-prepared questions.

24       I believe that we're at -- has the plaintiff been able to

25  identify, through discovery or deposition, written or

1   unwritten policies that direct the production of confidential

2   information or confidential material as a part of the process

3   for complying with the Public Records Act?

4        And the unwritten policy of engaging in a pattern or

5   practice of overdisclosing personal and private information

6   to avoid lawsuits, under the Public Records Act, as I said, I

7   think I already answered, this is in Defendant Saunders' job

8   description.

9        And so the next question is, can plaintiff cite to a

10  single case where negligently producing personal medical

11  information pursuant to the Public Records Act request has

12  been held to amount to unreasonable search and seizure, in

13  violation of the Fourth Amendment.

14       And I would like to draw this court's attention to

15  *Norman-Bloodsaw v. Lawrence Berkeley Laboratory*, and that's

16  135 F.3d 1260 at page 1269, and that's a Ninth Circuit Court

17  of Appeals case from 1998.  And in the *Norman-Bloodsaw* case,

18  the Ninth Circuit Court of Appeals says, quote, The

19  nonconsensual retrieval of previously unrevealed medical

20  information that may be unknown to even plaintiffs, these

21  tests may also be viewed as searches in violation of the

22  Fourth Amendment right that require Fourth Amendment

23  scrutiny, and these tested issues in this case can implicate

24  rights protected under both the Fourth Amendment and the

25  due-process clause of the Fifth or Fourteenth Amendments, end

1    quote.

2         And so the *Norman-Bloodsaw* court actually analyzed the

3    Fourth Amendment, and they said the unlawful disclosure of --

4    or the previously unrevealed medical information could

5    implicate the Fourth Amendment, and so that's a case where

6    it's been directly held upon.

7         But even there, as I talked about in the beginning, the

8    Fourth Amendment protects the search and the seizure, and the

9    commingling of the medical information is what violates the

10   Fourth Amendment.

11        The *Whalen* court -- I'm sorry.  I don't have the citation.

12   It's the United States Supreme Court case, I think, from

13   1976.

14        Off the top of my head, the *Whalen* court, Justice Brennan,

15   in the *Whalen* court -- oh, it's *Whalen v. Roe*,

16   429 U.S. 589 at page 607, and Justice Brennan said, in the

17   concurring opinion there, that the Fourth Amendment puts

18   limits not only on the information -- on the type of

19   information the state may gather, but also on the means that

20   they gather it.  And in that case, they were talking, I

21   believe, about a computer program that compiled a database of

22   prescription drug information.  And so they're talking about

23   cases that have talked directly on point about what this

24   court is asking, about where negligently producing personal

25   medical information -- and to be fair, the courts haven't

1   talked about negligence or what standard, whether it's

2   deliberate or intentional, but they talk about the Fourth

3   Amendment and the production of medical information

4   implicating the Fourth Amendment, and I think this court can

5   draw upon other cases, and whether this is deliberate

6   indifference or whether it's intentional through the pattern

7   or practice, there is a disputed issue of material fact

8   about -- that this has happened multiple times.

9        And the defendants just say that this is negligence, but

10  there's policies and procedures, and Defendant Saunders has

11  gone through training about this, and so they can't just

12  claim that it's negligence, because she knew not to produce

13  this information, and if you know not to do something and you

14  do it multiple times and your staff does it multiple times,

15  it no longer is mere negligence.  It rises to at least

16  deliberate indifference, if not an intentional or deliberate

17  conduct.

18       And so I think when you look at that and then you look at

19  the Fourth Amendment case law that says that the Fourth

20  Amendment can be implicated with the disclosure of medical

21  information, I think that meets your question, even though

22  you're talking about negligence, that we have a situation

23  here where it's alleged that there's evidence that there's a

24  pattern or practice, at least in the evidence most recently

25  viewed towards Ms. Dalessio, there is evidence of a pattern

1   or practice, and we have clear case law saying that the

2   Fourth Amendment can be implicated through the disclosure of

3   medical information.  And so I think that meets this question

4   of what this court was getting at with that question.

5       And then the next question that this court asked is that

6   defendants have cited to the Ninth Circuit case law -- or

7   Ninth Circuit law that violations of HIPAA and the ADA cannot

8   form a basis of a 1983 claim.  How is plaintiff's position

9   that defendants' alleged HIPAA and ADA violations define the

10  contours of the alleged constitutional -- of the alleged

11  violation of her constitutional rights any different than

12  claiming those alleged violations on the basis for a 1983

13  claim?

14      And Ms. Dalessio uses HIPAA and the ADA as independent

15  support for the Fourth and Fourteenth Amendment in case law

16  interpreting it to define the contours of her constitutional

17  rights.

18      As I just explained, the *Norman-Bloodsaw* court didn't rely

19  upon the ADA or HIPAA in order to say that the Fourth

20  Amendment could be implicated.  And other courts, in the

21  Fourteenth Amendment, haven't done that, either.  And so

22  whether it's the Fourth Amendment or the Fourteenth

23  Amendment, this court has clear case law that there's

24  constitutional violation without the ADA and HIPAA, and I

25  think that's the important point; is that the HIPAA and ADA

1   are not needed in order to establish a constitutional

2   violation because there's many cases that have been cited by

3   plaintiffs that state that the disclosure of medical

4   information -- and we can argue about what that disclosure

5   actually is, what shocks the conscience or things like

6   that -- but the disclosure of medical information can violate

7   the Fourth Amendment and the Fourteenth Amendment of the

8   United States Constitution, and they don't need the ADA or

9   HIPAA in order to get there.

10      And that's where defendant distort plaintiff's argument.

11   They're saying, "Look, they're conflating the ADA and HIPAA

12   in the Fourth Amendment and the Fourteenth Amendment," and

13   that's not -- that's not plaintiff's position at all.

14      Plaintiff's position to this court is that the Fourth

15   Amendment and the Fourteenth Amendment provide an independent

16   basis for this court to rule on, just like many other courts

17   have found, without even considering the ADA and HIPAA, that

18   there have been violations to the Constitution for disclosure

19   of private medical information.

20      But when you look at that the Constitution can be violated

21   through the disclosure of private medical information, the

22   court can then use HIPAA and ADA as an independent basis to

23   decide, as bright-line standard, to decide.  And in an

24   instance such as this, if that is shocking or if that is

25   unconscienable, and if it does rise to that level --

1    And so to answer this court's question, the reason why we

2    haven't cited any case law is because it's not necessary.  A

3    violation of the Constitution occurs independently, and the

4    statutory basis, as we talked about -- as we try to talk

5    about in the *Nicholas v. Wallenstein* case, the statutory

6    basis provides -- defines the contours of the privacy rights.

7    And the Ninth Circuit Court of Appeals, in *Nicholas v.*

8    *Wallenstein*, which this court has cited in at least one of

9    its orders, and I know that defendants have cited it a couple

10   of times, too -- in the *Nicholas v. Wallenstein* case, 266

11   F.3d 1083, a Ninth Circuit Court of Appeals case from 2001,

12   that court analyzed whether disclosure of plaintiff's name,

13   through the Public Records Act, then the Public Disclosure

14   Act, violated their right to privacy.

15   The court wrote, quote, But the statute is of relevance in

16   determining what privacy public personnel expected to have,

17   and that's at page 1088.

18   The court found, as a matter of law, that the names --

19   that the, quote, names involved -- that the names of the

20   involved personnel were not exempt from disclosure, end

21   quote.

22   So the court then circled back, and they said, "Okay,

23   privacy" -- "privacy rights can be involved, but you know

24   what?  This was an authorized disclosure."  There was nothing

25   exempting these names from disclosure under the Public

1    Records Act, and that's the difference between the *Nicholas*

2    *v. Wallenstein* case and what we have here.

3        This disclosure was clearly prohibited under the Public

4    Records Act because HIPAA, ADA, and other statutes clearly

5    prohibited it and exempted this information from disclosure

6    under the Public Records Act, and so that's why privacy is

7    implicated here, and privacy wasn't implicated in the

8    *Nicholas v. Wallenstein* case.

9        Defendants also argue -- they cite cases, and they say

10   that -- they cite -- there's the *Iceberg* case and something

11   else, but those cases -- they argue that the ADA can't even

12   be used in order to define -- the ADA and HIPAA can't even be

13   used to define the Fourth Amendment or the Fourteenth

14   Amendment, and they cite the *Iceberg* case and, I think, the

15   *Vincent* case, which I think the *Vincent* case is a published

16   Ninth Circuit Court of Appeals case.  But in both of those

17   cases, they had independent ADA claims, and I believe that

18   they both cited Title II of the ADA, and they argue -- they

19   argued to the merits whether there was ADA violations, and

20   then also they double-back and -- to use the defendants'

21   words, they double-back, and they use the ADA again, under

22   1983.  So it's kind of like they were double-dipping on this

23   ADA claim.  They made the same arguments under the ADA as

24   they used under 1983 again, and they said, "Look, this action

25   violated the ADA, and then it also violated 1983 because it

1  violated the ADA."  And that's the difference between what

2  we're having here.

3      Plaintiff's argument to this court is that the

4  Constitution provides its own basis, as many cases have held

5  that the Fourth Amendment and the Fourteenth Amendment can be

6  violated through the disclosure of medical information, and

7  you don't need the ADA in order to get there, although it is

8  very helpful and it is very persuasive in order to identify

9  where those contours actually are.

10      And then I'll move to, I believe, this court's

11  second-to-the-last question:  What authority does this

12  plaintiff have for the arguments that one of the recognized

13  legal standards above negligence is a pattern or practice of

14  behavior?

15      I believe this was addressed before.  I'll go over it

16  quickly.

17      But the Western District of Washington, in an unpublished

18  case, in *Thompson v. City of Olympia*, this year, in 2019, to

19  impose liability under 1983, a plaintiff must show, one, that

20  they were deprived of the constitutional rights by defendants

21  and their employees while acting under the color of state

22  law; two, defendants have customs or policies which amount to

23  deliberate indifference to their constitutional rights; and

24  three, that these policies are moving -- are the moving force

25  behind the constitutional violations.  And that case cites

1    *Lee v. City of Los Angeles,* which is a published case,

2    250 F.3d 668, which is a Ninth Circuit Court of Appeals.

3        So in showing deliberate indifference, ordinarily it

4    requires demonstrating a pattern of similar constitutional

5    violations by untrained employees.  Here, we have trained

6    employees, which should be even more egregious.  It's not

7    just untrained employees who are kind of guessing as to

8    what's going on or they believe that this violates the

9    Constitution.  These are trained employees that know the

10   difference.

11       Defendant Saunders' job description states that she is

12   trained.  She is expected to know specifically about HIPAA

13   and the ADA in her job description, and so this is even more

14   egregious because it's a knowing violation at that point,

15   whereas untrained employees believe that they're acting the

16   right way, but if they do it, it becomes deliberate

17   indifference.  As I argued before, this rises above

18   deliberate indifference because she was trained and she was

19   expected to know the law, she was expected to know HIPAA, she

20   was expected to know ADA, and as the director and as the

21   public records officer, she was expected, under state

22   statute, to ensure compliance with the people who are

23   disclosing those requests underneath her.

24       So that's what I believe answers this court's question

25   about the recognized legal standard above negligence is that

1    we're arguing through a pattern and practice that it's, at

2    least, deliberate indifference, if not intentional, and with

3    more discovery, I believe we can prove that.

4        And the last question -- and I'll just go over this real

5    quickly for this court -- what evidence does plaintiff have

6    for the number of instances that allegedly -- of the alleged

7    improper disclosure of information regarding the third

8    parties to which he can testify represents a statistically

9    significant sample such that she can establish that it

10   represents a pattern and practice by defendants?

11       We haven't been given discovery.  We've been given very

12   limited discovery, and so we'd have to look at -- to answer

13   this court's question honestly, we'd have to look at all the

14   disclosures by Ms. Dalessio and we'd have to look at all the

15   disclosures by defendants to know if there is a true pattern

16   and practice.  But on the evidence in front of us, it has

17   been identified that defendants disclosed disability

18   information about Ms. Dalessio to Mr. Betz, and defendants

19   have disclosed private medical information about Ms. Dalessio

20   to herself, and defendants have not identified any

21   information to show that this behavior has stopped, or even

22   testified to say that they haven't done it since.  And that

23   information is solely within the realm of defendants.

24       In fact, the United States Supreme Court has stated,

25   quote, It's observed that the facts of good faith and the

1    facts of underlying immunity depend on the facts peculiarly

2    within the knowledge and control of the defendants, end

3    quote.  That's *Schultea v. Wood*, at 47 F.3d 1427 at page

4    1431, which is a Fifth Circuit Court of Appeals case from

5    1995, which is quoting *Gomez v. Toledo*, which is cited in our

6    response brief.

7         And so that's something that I would respectfully submit

8    to this court; that it's the defendants' burden of proof, and

9    they haven't proved that.  They haven't even conclusory

10   stated that this hasn't happened again, and so there's no way

11   to know, and the only evidence in front of this court is that

12   it's happened to Mr. Betz.  This information was disclosed to

13   Mr. Betz, this information was disclosed to Ms. Dalessio, and

14   there's been nothing in the record to say that it hasn't

15   happened again.  The reasonable inference is that it has

16   happened again, and we just don't know it yet.

17        Thank you.

18             THE COURT:  Thank you.

19        Ms. Freeman, do you wish to respond?

20             MS. FREEMAN:  I'd like to respond to a couple of

21   points, and, certainly, Your Honor, if you have any

22   questions, I am happy to answer any questions.

23             THE COURT:  The first question is, counsel takes the

24   position that any disclosure of any medical information, no

25   matter what its nature or how de minimis, is a constitutional

1   violation.

2          MS. FREEMAN:  Yes, and that's just not the case.

3       The case law makes it clear that there is a different and

4   unique standard to establish a right to privacy that rises to

5   the level of protection by the U.S. Constitution.

6       The U.S. Constitution existed long before HIPAA, long

7   before ADA, long before any number of federal or state

8   statutes, and, in fact, long before the Public Records Act of

9   the State of Washington as well, and it will continue on

10  after.

11      One of the specific reasons why HIPAA and ADA cannot be

12  used, relied on, or referred to to delineate the scope of a

13  constitutional interest here is because that was a federal

14  statute that was adopted by Congress, and Congress adopted it

15  for a reason.  And Congress said within the statute, "Here's

16  the reasons we're adopting these statutes, here's where they

17  apply," and has specifically provided, as a balance, to

18  whatever interest the federal government decided was

19  important, "here are the remedies that are available if you

20  violate the terms of that particular statute."  It's very

21  clear, both based on that legislation and based on federal

22  case law that the remedial scheme available under HIPAA and

23  ADA is limited to the purposes for which it was passed and

24  cannot be used to establish, outside the four corners of that

25  remedial scheme, a different constitutional thing.

1       When we turn to the cases that are most on point here,

2   which are a number of cases cited -- the *Summe* case, the

3   *Cooksey*, the *Weisberg* case, *Annabel*, and the *Jarvis v.*

4   *Wellman* cases, those all, actually -- those are federal cases

5   that actually did involve situations where -- specifically

6   medical information, and often very personal and private

7   medical information was disclosed, sometimes about employees.

8   One involved a city that disclosed their police chief had

9   been undergoing psychiatric treatment and discussed a

10  fitness-for-duty evaluation and its results; one involved a

11  sexual assault victim whose medical records were released to

12  her father, who happened to be the perpetrator, EAP medical

13  records of an employee that were released, and in each of

14  those cases, the courts take great pains to remind the reader

15  that rights that are protected by the United States

16  Constitution are very, very specific, and the threshold to

17  meet an actual constitutional right of privacy is very, very

18  limited.

19      And that's where that language comes from, the -- that

20  says -- the information itself, not just -- there is no

21  holding that says medical information, in and of itself, is

22  protected by the Constitution or does rise to the level of

23  constitutional protection.  The courts say the information

24  disclosed must either be a shocking degradation or an

25  egregious humiliation.  And those are all in the cases where

 1   they are, from a fundamental standpoint, already discussing

 2   medical information.  There is no case that says any

 3   disclosure of medical information, however minor or however

 4   mundane or even however private or embarrassing, rises to

 5   that shocking degradation or egregious humiliation standard

 6   that is required to be covered by the United States

 7   Constitution.  The federal courts recognize that there are

 8   all of these remedial statutes that, in the right context,

 9   which is not present here, there may be other remedial

10   schemes if something occurs.

11        This is all -- you know, comes back to the balancing act

12   that both Congress and the State Legislature in Washington

13   has done when they adopted also statutes like the Public

14   Records Act that require these employees to go through this

15   exercise.

16            THE COURT:  Let's talk about specific pages here,

17   pages 69 to 77.

18            MS. FREEMAN:  Yes.

19            THE COURT:  What medical information do you believe

20   is revealed there, if any?

21            MS. FREEMAN:  I, actually, don't think any medical

22   information is revealed.

23        In the pages that were produced to Mr. Betz, the first

24   page is a standard form that exists at the university, and

25   it's called a disability accommodation form, and there are

1    some marks on there that look like it may have been filled

2    out, but there is absolutely nothing on that form that is

3    readable.  I can't read any medical information about anybody

4    on that form or even see a name.

5        The next few pages involve a typical workplace

6    accommodation letter.  And as you can see when you look at

7    the pages, great pains have been taken to redact certain

8    words and certain phrases that, presumably, actually describe

9    any medical condition.

10       Counsel suggested that a medical condition can be derived

11   from reading that letter because it referenced some of the

12   plaintiff's job duties, and I disagree that is in any way a

13   disclosure of medical information.

14       That is, again, pursuant to the Public Records Act law

15   that the university employees are required to comply with,

16   that law provides guidance that instructs them to make

17   efforts to not just withhold documents but, where possible,

18   to redact specific medical information, which was clearly

19   done by Ms. Swenson here.

20           THE COURT:  So a reference to a pipette isn't

21   necessarily a reference to having a bad thumb?

22           MS. FREEMAN:  No, Your Honor.  That's simply a

23   reference to part of the job duties.  There is nothing in

24   there that describes why someone maybe could or could not use

25   a pipette.  And, in fact, it doesn't reference medical

1   information at all.

2       Let me go one step further.  Even if it had, even if there

3   was a reference in that letter that was not redacted about a

4   thumb problem that made it difficult to use a pipette, that

5   simply is not the type of shockingly degrading medical --

6   private medical information that would, again, rise to that

7   level of a constitutional violation.

8       The last set of documents, counsel described as something

9   filled out by the supervisor.  That's, actually, not what it

10  is.  If you look at the document, it's not signed by a doctor

11  or anything like that.  It's called a job analysis, and it is

12  a standard form, again, where someone from a different office

13  comes in and watches -- gathers information and watches what

14  that particular job requires, and then they fill out this

15  form that is sent with an employee to their doctor to ask the

16  doctor if they can do X, Y, and Z.  The form itself was just

17  prepared by someone who was analyzing the job, not

18  Ms. Dalessio herself, and it includes no medical information

19  at all.  It's not from a doctor.

20          THE COURT:  More like a vocational evaluation?

21          MS. FREEMAN:  It's exactly like a vocational

22  evaluation.

23          THE COURT:  All right.

24      Let me ask you another question.

25      Opposing counsel seems to think you have the burden of

1    both persuasion and production here; is that correct?

2           MS. FREEMAN:  No, Your Honor.  I would disagree.  We

3    have been involved in this lawsuit for a few years.  I've

4    heard references to discovery.  We have engaged in a lot of

5    discovery.  Plaintiff has brought motions to compel; the

6    court has ruled on motions to compel.

7      We're now at the summary judgment stage, and this is the

8    third time that we have tried to get before the court, moving

9    for summary judgment, which, at that point, prompts the

10   plaintiff to then produce evidence that would overcome the

11   legal standards we've set forth that entitle my clients to

12   dismissal.

13     Plaintiffs have the burden of proof at trial.  Plaintiffs,

14   at this point, have the burden to produce evidence to show

15   that there is a question of material fact that actually

16   precludes the court from ruling on these claims, and at this

17   point there is not.  I do not agree with plaintiff's

18   statements that defendants have a burden to -- I wasn't quite

19   clear on their arguments, but I don't agree with those

20   statements.

21          THE COURT:  Okay.  Is there anything else you would

22   like to argue to me?

23          MS. FREEMAN:  I think the rest of it is fairly

24   self-explanatory.  There was a lot of time spent on Eliza

25   Saunders' job description.  I disagree that that, in any way,

1    is evidence of any specific action that Ms. Saunders took in

2    this case or that any other defendant took.  Plaintiff has

3    failed to demonstrate, either legally or with evidence, that

4    any defendant who is being sued in this case has violated

5    Ms. Dalessio's constitutional rights or that should not be

6    dismissed because they're entitled to qualified immunity from

7    all of the claims, and I'd ask that you enter an order

8    dismissing the remaining claims against the remaining

9    defendants.

10        Thank you.

11            THE COURT:  Thank you.

12        Thank you for your arguments, counsel.  I will be filing a

13    written opinion for you, and I'm hoping to get that to you by

14    the close of business this Friday.

15        Thank you.  Have a good afternoon, and please look for the

16    order.

17                 (Court in recess at 3:10 p.m.)

18

19

20

21

22

23

24

25

# C E R T I F I C A T E


       I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

       I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


       Dated this 23rd day of September.


              /S/  Nancy L. Bauer

              Nancy L. Bauer, CCR, RPR
              Official Court Reporter